**No. 25-1413/25-1414**

**IN THE UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT**

---

MARY DOE; JOHN DOE A; JOHN DOE B; JOHN DOE C; JOHN DOE D; JOHN DOE E; JOHN DOE G; JOHN DOE H; and MARY ROE,

*Plaintiffs-Appellants Cross-Appellees*

v.

GRETCHEN WHITMER, Governor of the State of Michigan; and JAMES GRADY II, Colonel,

*Defendants- Appellees Cross-Appellants*

---

On Appeal from the United States District Court
for the Eastern District of Michigan
Case No. 2:22-cv-10209 (The Honorable Mark A. Goldsmith)

---

# BRIEF OF LAW PROFESSORS AS AMICI CURIAE IN SUPPORT OF PLAINTIFFS-APPELLANTS' EX POST FACTO CLAIM

---

David A. Moran
University of Michigan Law School
701 South State St.
Ann Arbor, MI 48109
(734) 615-5419
morand@umich.edu

***Counsel for Amici***

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ii

INTEREST OF THE AMICI CURIAE 1

SUMMARY OF ARGUMENT 1

ARGUMENT 4

I. SORA Trammels the Core Purposes of the Ex Post Facto Clause 4

II. Application of the "Clearest Proof" Standard Should Be Limited to Its Original Intended Purpose 12

CONCLUSION 21

APPENDIX A 23

## TABLE OF AUTHORITIES

Constitutional Provision

U.S. Const. Art. I., § 10 ........................................................ 1, 2, 4, 15

Statutes

M.C.L.§ 28.721a (2023) ........................................................................ 18
M.C.L. § 28.724 (2023) ........................................................................ 20
M.C.L. § 28.729 (2023) ........................................................................ 20

Cases

*Burgess v. Salmon,* 97 U.S. 381 (1878) ................................................ 18
*Calder v. Bull*, 3 U.S. (3 Dallas) 386 (1798) ...................................... 6, 12
*California Department of Corrections v. Morales*, 514 U.S. 499 (1995) 15
*Carmell v. Texas*, 529 U.S. 513 (2000) ............................................. 9, 16
*Collins v. Youngblood*, 497 U.S. 37 (1990) ........................................... 13
*Comm. v. Baker*, 295 S.W.3d 437 (Ky. 2009) ....................................... 21
*Comm. v. Cory*, 911 N.E.2d 187 (Mass. 2009) ..................................... 17
*Cummings v. Missouri*, 71 U.S. (4 Wall.) 277 (1867) .............. 7, 8, 18, 19
*De Veau v. Braisted*, 363 U.S. 144 (1960) ............................................ 19
*Doe v. Alaska*, 189 P.3d 999 (Alaska 2008) .......................................... 21
*Doe v. New Hampshire*, 111 A.3d 1077 (N.H. 2015) ............................ 21
*Doe v. Dept. of Public Safety and Corr. Servs.*, 62 A.3d 123 (Md. Ct. App. 2013) ........................................................................................ 21
*Does #1-5 v. Snyder,* 834 F.3d 696 (6th Cir. 2016) ................... 11, 20, 21
*Dufresne v. Baker,* 744 F.2d 1543 (11th Cir. 1984) ................................ 8
*Eastern Enterprises v. Apel*, 524 U.S. 498 (1988) ................................ 10
*Hudson v. United States*, 522 U.S. 93 (1997) ....................................... 14
*Fletcher v. Peck*, 10 U.S. (6 Cranch) 87 (1810) ........................................ 6
*James v. United States*, 366 U.S. 213 (1961) ....................................... 10
*Kring v. Missouri,* 107 U.S. 221 (1883) ................................................ 13
*Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963) ......................... 3, 17
*Landgraf v. USI Film Prods.*, 511 U.S. 244 (1994) ................................ 7
*Lynce v. Mathis*, 519 U.S. 433 (1997) ...................................................... 9
*Marks v. United States*, 430 U.S. 188 (1977) ........................................ 12

*Nixon v. Adm'r of Gen. Servs.*, 4333 U.S. 425 (1977) ............................16
*Ogden v. Saunders*, 25 U.S. (12 Wheat.) 212 (1827) ............................15
*Smith v. Doe*, 538 U.S. 84 (2003) .................................... 3, 16, 17, 19, 21
*Starkey v. Oklahoma Dept. of Corrections*, 305 P.3d 1004 (Ok. 2013) ..21
*State v. Hinman*, 530 P.3d 1271 (Mont. 2023) ......................................21
*State v. Letalien*, 985 A.2d 4 (Maine 2009) .......................................5, 21
*State v. Williams*, 952 N.E.2d 1108 (Ohio 2011) ..................................21
*Stogner v. California*, 539 U.S. 607 (2003) .......................................9, 10
*St. Regis Paper Co. v. United States*, 368 U.S. 208 (1961) ......................9
*Sveen v. Melin*, 584 U.S. 811 (2018) .....................................................10
*United States v. Brown,* 381 U.S. 437 (1965) ..........................................8
*United States v. Davis*, 588 U.S. 445 (2019) ..........................................14
*United States v. Lovett*, 328 U.S. 303 (1946) .........................................16
*Wallace v. Indiana*, 905 N.E.2d 371 (Ind. 2009) ...................................21
*Weaver v. Graham*, 450 U.S. 24 (1981) .............................................9, 12

Other Authorities

Alexander Hamilton, THE FEDERALIST PAPERS, No. 84 (Clinton Rossiter ed.) (1961)...........................................................................5
James Madison, THE FEDERALIST PAPERS, No. 44 (Clinton Rossiter ed.) (1961) ..........................................................................6
WAYNE A. LOGAN, KNOWLEDGE AS POWER: CRIMINAL REGISTRATION AND COMMUNITY NOTIFICATION LAWS IN AMERICA (2009) ........................11
WAYNE A. LOGAN, THE EX POST FACTO CLAUSE: ITS HISTORY AND ROLE IN A PUNITIVE SOCIETY (2022) ...............................................13, 15
CHRISTOPHER G. TIDEMAN, A TREATISE ON THE LIMITATIONS ON POLICE POWER IN THE UNITED STATES CONSIDERED FROM BOTH A CIVIL AND CRIMINAL STANDPOINT (1886) .........................................................19

## INTEREST OF THE AMICI CURIAE AND AUTHORITY TO FILE

Amici curiae are law professors who specialize in substantive criminal law, criminal procedure, and federal constitutional law, in particular the Ex Post Facto Clause found in Article I, section 10, of the U.S. Constitution.[1] As law professors, amici have an interest in assisting the Court to ensure that the Ex Post Facto Clause is enforced in a manner consistent with its core goals and principles. A list of amici with brief descriptions of their backgrounds is appended (Appendix A). Amici have filed a contemporaneous motion for leave to file this brief.

## SUMMARY OF ARGUMENT

Michigan has retroactively imposed multiple onerous burdens on people previously convicted of a broad array of sexual offenses. These burdens stem automatically from their convictions, with no individualized determinations of current or future risk, and differ in

[1] Pursuant to Fed. R. App. P. 29(a)(4)(E), amici curiae state that no counsel for a party authored this brief in whole or in part, and no party or counsel for a party contributed money intended to fund the preparation or submission of this brief. No person other than amici curiae or their counsel contributed money intended to fund the preparation or submission of this brief.

degree and in kind from those previously condoned by the U.S. Supreme Court. This Court should find that Michigan's retrospective application of its 2021 Sex Offenders Registration Act (SORA) violates the Ex Post Facto Clause of Article I, section 10 of the U.S. Constitution.[2]

This brief makes two points. First, relying upon historical and doctrinal background, it demonstrates that Michigan's retroactive imposition on targeted individuals of multiple onerous burdens implicates the core concerns of the Ex Post Facto Clause. The Framers of the Constitution included the Clause in Article I because they were acutely aware of the propensity of state legislatures to enact burdensome retroactive laws, which, because of their backward-looking reach, single out particular disfavored individuals (here, those previously convicted of sexual offenses). The Framers also singled out ex post facto laws for prohibition because they fail to provide notice of the nature and extent of criminal prohibitions and punishments. The Michigan SORA entails

---

[2] *See* Art. I., sec. 10 (providing that "[n]o state shall…pass any…ex post facto Law"….). All parties have consented to the filing of this brief. No party's counsel authored this brief, nor did any party or party's counsel or any person other than amici contribute money for the preparation and submission of this brief.

precisely the sort of retroactive targeting of disdained individuals that the Ex Post Facto Clause was—and is—intended to guard against.

Second, the brief addresses a feature of ex post facto jurisprudence that has sown considerable confusion. In order for a law to be prohibited by the Ex Post Facto Clause it must retroactively impose "punishment" on individuals. To make this determination a court must apply the intent-effects test: first determine whether the legislature intended the challenged law to be punitive; if not, if the law is instead civil-regulatory in nature, it must be deemed punitive in effect, based on the criteria identified in *Kennedy v. Mendoza-Martinez.*[3] Ultimately, only the "clearest proof" will "override legislative intent and transform what has been denominated a civil remedy into a criminal penalty."[4]

As this brief demonstrates, the "clearest proof" requirement, a late-twentieth century addition to Ex Post Facto Clause jurisprudence, has been misconstrued and misapplied by courts in recent decades. Rather than being a demanding proof requirement for petitioners to surmount,

---

[3] 372 U.S. 144, 169 (1963). *See also Smith v. Doe*, 538 U.S. 84, 97 (2003) (applying five of the seven *Mendoza-Martinez* factors in deeming the "effects" of an early-generation SORA provision non-punitive).
[4] *Smith*, 538 U.S. at 92 (cleaned up).

as it has come to be, "clearest proof" appeared in the Court's 1960 decision *Flemming v. Nestor*[5] as an expression of the accepted tenet of construction that a challenged law be accorded a presumption of constitutionality. That the law has evolved in this way is especially problematic given the Framers' plain fear of and disdain for burdensome retroactive laws, which the Ex Post Facto Clause was intended to guard against.

## ARGUMENT

### I. SORA Trammels the Core Purposes of the Ex Post Facto Clause

The decision by the Framers to prohibit ex post facto laws in the body of the Constitution was no accident. Nor was their decision to actually impose two such limits in Article I, section 9, restricting Congress, and section 10, restricting state legislatures, one of the very few civil liberty protections designated in a document otherwise principally dedicated to defining the structure and operation of the federal government. As the Supreme Judicial Court of Maine would recognize over two centuries later, "[t]he framers' decision to include the

[5] 363 U.S. 603 (1960).

ex post facto clause in the body of the Constitution adopted in 1787, and not to defer consideration to the amendment process that would follow, is evidence that the framers viewed the federal ban on ex post facto laws as fundamental to the protection of individual liberty."[6]

Although scholarly debate has long existed over the meaning and purpose of various provisions of the U.S. Constitution, there is no questioning that the ex post facto prohibitions were motivated by the Framers' acute concern over the recognized propensity of legislatures to enact burdensome retroactive laws targeting politically unpopular individuals. Alexander Hamilton spoke to this concern in the *Federalist Papers* when he singled out the Clause as a prime reason for state ratification of the Constitution (which contained no Bill of Rights), writing that ex post facto laws "have been, in all ages, the favorite and most formidable instruments of tyranny."[7] To Hamilton, the "[p]rohibition of ex post facto laws" was among the greatest "securities to liberty and republicanism [the Constitution] contains."[8]

---

[6] *State v. Letalien*, 985 A.2d 4, 13 (Maine 2009).
[7] THE FEDERALIST PAPERS, No. 84, at 512 (Alexander Hamilton) (Clinton Rossiter ed., 1961).
[8] *Id.* at 511.

Fellow *Federalist Papers* contributor James Madison described ex post facto laws as "contrary to the first principles of the social compact, and to every principle of sound legislation," and regarded the Clause as an integral part of the Constitution's "bulwark in favor of personal security and private rights."[9] Early members of the Supreme Court were equally aware of the need to constrain legislatures. Justice Samuel Chase, in *Calder v. Bull* (1798), one of the Court's first decisions, wrote that "the advocates of [ex post facto] laws were stimulated by ambition, or personal resentment, and vindictive malice. To prevent such, and similar, acts of violence and injustice . . . the Federal and State Legislatures were prohibited from passing any . . . Ex Post Facto Law."[10]

A few years later, in *Fletcher v. Peck* (1810), Chief Justice John Marshall echoed this view, recognizing that "the framers of the constitution viewed, with some apprehension, the violent acts which might grow out of the feelings of the moment" and that adoption of the Ex Post Facto Clause reflected among Americans "a determination to shield themselves...from the effects of those sudden and strong passions

---

[9] *Id.*, No. 44, at 287, 282 (James Madison).
[10] 3 U.S. (3 Dallas) 386, 389 (1798).

to which men are exposed."[11] The Clause was needed, Marshall wrote, to preclude legislatures from enacting retroactive punishments when they were caught up in the "feelings of the moment" and subject to "sudden and strong passions" toward a particular disfavored population.[12]

Over time, a veritable "who's who" of disfavored Americans has invoked the Ex Post Facto Clause as a basis for protection: including, in the late 1860s, Confederate sympathizers; at the turn of the twentieth century, immigrants and prostitutes; in the 1950s, former members of the Communist Party; and in the 1990s through today, individuals convicted of sexual offenses. In one of the two Confederate sympathizer cases, *Cummings v. Missouri*,[13] the Supreme Court invalidated on ex post facto grounds the conviction of a Roman Catholic priest who was prohibited from preaching for lack of satisfying the state's required "loyalty oath."[14] The Court concluded that the law's retroactive

---

[11] 10 U.S. (6 Cranch) 87, 137-38 (1810).

[12] *Id.* For a modern recognition of this concern *see Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994) (recognizing that a legislature's "responsivity to political pressures poses a risk that it may be tempted to use retroactive legislation as a means of retribution against unpopular groups or individuals").

[13] 71 U.S. (4 Wall.) 277 (1867).

[14] *Id.* at 316-317.

prohibition of professional association retroactively punished the petitioner and was a product of "the excited action of the State[] . . . [against which] that the Framers of the Federal Constitution intended to guard."[15] The Ex Post Facto Clause, the Court stated, "was intended to secure the liberty of the citizen" and "cannot be evaded by the form in which the power of the State is exerted."[16]

In keeping with this understanding, the Court has empahasized that the reach of a constitutional provision should turn on the "reasons" it was included in the Constitution, and "the evils it was designed to eliminate." [17] To that end, it is important to be mindful of the several critically important purposes that that the Ex Post Facto Clause was intended to serve.

Perhaps foremost is that it "restricts governmental power by restraining arbitrary and potentially vindictive legislation" and guards

---

[15] *Id.* at 322.
[16] *Id.* at 329.
[17] *United States v. Brown*, 381 U.S. 437, 442 (1965); *see also, e.g., Dufresne v. Baker*, 744 F.2d 1543, 1546 (11th Cir. 1984) ("When subjecting a law to ex post facto scrutiny, courts should bear in mind the related aims of the ex post facto clause….").

against "legislative abuses."[18] In doing so, as the Court noted in *Carmell v. Texas*,[19] the Clause helps ensure "fundamental fairness," in that ex post facto laws have one thing in common: "In each instance, the government refuses, after the fact, to play by its own rules, altering them in a way that is advantageous only to the State...."[20] Writing for the majority in *Carmell*, Justice Stevens stated that "[t]here is plainly a fundamental fairness interest...in having the government abide by its own rules of law it establishes to govern the circumstances under which it can deprive a person of his or her liberty or life."[21]

---

[18] *Weaver v. Graham*, 450 U.S. 24, 29 (1981). *See also Stogner v. California*, 539 U.S. 607, 611 (2003) (citation omitted) (emphasizing "fairness" concerns animating the Ex Post Facto Clause and the expectation that the government "play by its own rules," stating that "the Clause protects liberty by preventing governments from enacting statutes with 'manifestly unjust and oppressive' retroactive effects").

[19] 529 U.S. 513, 533 (2000).

[20] *Id.* at 533.

[21] *Id. See also Lynce v. Mathis*, 519 U.S. 433, 440 (1997) (1997) (stating that "the Constitution places limits on the sovereign's ability to use its lawmaking power to modify bargains it has made with its subjects"). It was this same concern that prompted Justice Hugo Black, author of several decisions in the mid-twentieth century invoking the Clause to grant relief, to insist that "the Government should turn square corners in dealing with the people." *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (1961) (Black, J., dissenting).

The Clause guards against this unfairness. It does not prohibit enactment of arbitrary or vindictive laws generally, but only those that are arbitrary or vindictive due to their retroactive force. With retroactive laws, legislators can single out already identified parties who are disfavored (and who cannot change their past actions), confident in the knowledge that the electorate will back them. As the Court recognized in *Stogner v. California*,[22] the Clause guards against "allowing legislatures to pick and choose when to act retroactively," which "risks both 'arbitrary and potentially vindictive legislation.'"[23] Ensuring that laws apply prospectively, not retroactively, Justice Gorsuch recently noted, "prevents majoritarian legislatures from condemning disfavored minorities for past conduct they are powerless to change."[24]

---

[22] 539 U.S. 607 (2003).

[23] *Id.* at 611 (citation omitted).

[24] *Sveen v. Melin*, 584 U.S. 811, 827 (2018) (Gorsuch, J., dissenting). *See also Eastern Enterprises v. Apel*, 524 U.S. 498, 848 (1988) (Kennedy, J., concurring) (citation omitted) (noting that the Court's cases "reflect our recognition that retroactive lawmaking is a particular concern for the courts because of the legislative 'tempt[ation] to use retroactive legislation as a means of retribution against unpopular groups or individuals'"); *James v. United States*, 366 U.S. 213, 247 n.3 (1961) (Harlan, J., concurring in part and dissenting in part) ("the policy of the prohibition against ex post facto legislation …rest[s] on the apprehension that the legislature in imposing penalties upon past conduct…may be acting with a purpose not to prevent dangerous conduct generally but to

Michigan's 2021 SORA is a prime example of the kind of abusive retroactive legislation the Framers sought to prohibit. Individuals convicted of sex offenses are surely a disdained subpopulation—the target of massive and severe opprobrium—and easy targets for political actors seeking electoral benefit.[25] Michigan has singled them out for a broad array of onerous burdens, often imposed for lifetimes, triggered automatically by a prior conviction (no matter how long ago it occurred), and with very little chance for relief. As this Court recognized in its landmark decision in *Does #1-5 v. Snyder*, invalidating Michigan's predecessor SORA:

> the fact that sex offenders are so widely feared and disdained by the general public implicates the core counter-majoritarian principle embodied in the Ex Post Facto Clause. As the founders rightly perceived, as dangerous as it may be not to punish someone, it is far more dangerous to permit the government under the guise of civil regulation to punish people without prior notice.[26]

---

impose by legislation a penalty against specific persons or classes of persons").

[25] *See* WAYNE A. LOGAN, KNOWLEDGE AS POWER: CRIMINAL REGISTRATION AND COMMUNITY NOTIFICATION LAWS IN AMERICA 85-108 (2009).

[26] 834 F.3d 696, 705-06 (6th Cir. 2016).

Another chief purpose of the Clause is to ensure that individuals receive fair notice of criminal prohibitions and punishments.[27] Legislatures of course can—and regularly do—enact criminal laws with prospective effect. Prospective laws allow individuals to conform their conduct to existing law, know the consequences of failing to comply, and assure that government will act fairly and abide by law in effect at the time of conviction. In short, the "passions of the moment" of concern to Chief Justice Marshall can only be directed only at future, not past, activity. The Michigan SORA flouts this bedrock principle and violates a core requirement of the Ex Post Facto Clause.

## II. Application of the "Clearest Proof" Standard Should Be Limited to Its Original Intended Purpose

The Ex Post Facto Clause was among the first constitutional provisions interpreted and applied by the Supreme Court.[28] In subsequent nineteenth century decisions, the Court, acutely aware of the

---

[27] *Weaver v. Graham*, 450 U.S. 24, 28-29 (1981). *See also Marks v. United States*, 430 U.S. 188, 191 (1977) (noting "the principle on which the [Ex Post Facto] Clause is based—the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties—is fundamental to our concept of constitutional liberty").

[28] *See Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798) (Chase, J.).

crucial structural role played by the Clause in limiting abusive retroactive legislation, forcefully applied the Clause with this role in mind and invalidated burdensome retroactive laws.[29] Summarizing its decisions in 1883, the Court emphasized the "liberal construction" it had provided the Clause when addressing ex post facto challenges, "a construction in manifest accord with the purpose of the constitutional convention to protect the individual rights of life and liberty against hostile retrospective legislation."[30]

Decades later, however, the Court introduced a constitutional framework at odds with this liberal construction: that the "clearest proof" of legislative punitiveness be present for a challenged law to violate the Ex Post Facto Clause. The requirement belatedly and unexpectedly originated in the Court's 1960 decision in *Flemming v. Nestor*,[31] a complex case posing the question of whether a federal law retroactively disqualifying certain deportees from obtaining social security violated

---

[29] SEE WAYNE A. LOGAN, THE EX POST FACTO CLAUSE: ITS HISTORY AND ROLE IN A PUNITIVE SOCIETY 37-49 (2022) [HISTORY AND ROLE] (discussing caselaw of the period).

[30] *Kring v. Missouri*, 107 U.S. 221, 229 (1883), *overruled on other grounds*, *Collins v. Youngblood*, 497 U.S. 37, 50 (1990).

[31] 363 U.S. 603 (1960).

the Clause. By a 5-4 vote, the Court held that the deprivation was not punitive because the congressional legislative record suggested no punitive intent. The Court buttressed its conclusion by stating that only the "clearest proof could suffice to establish" that the enacted law was actually punitive, not civil in intent, invoking the accepted precept that a reviewing court is to presume that a challenged law is constituional.[32]

Unfortunately, in the decades since *Nestor*, what was intended as an averment of a basic interpretive expectation,[33] has been erroneously understood as a substantive feature of ex post facto doctrine. Although courts have recognized this error,[34] the requiremet has become a near-insurmoutnable obstacle to relief.[35] In doing so they have sapped the Ex

[32] *See id.* at 617 (noting "the presumption of constitutionality with which this enactment, like any other, comes to us forbids us lightly to choose that reading of the statute's setting which will invalidate it over that which will save it").

[33] *See, e.g., United States v. Davis*, 588 U.S. 445, 463 n.6 (2019).

[34] *See, e.g., E.B. v. Verniero*, 119 F.3d 1007, 128 (3d Cir. 1997) ("I warn against placing too much emphasis on the meaning of 'clearest proof.' As [*Nestor*] and its progeny make patent, the standard is intended as a kind of warning to the federal courts to give legislatures the benefit of the doubt. It is thus consistent with the familiar canons of statutory interpretation and constitutional adjudication.").

[35] In *Hudson v. United States*, 522 U.S. 93 (1997), which addressed whether particular sanctions were punitive under the Double Jeopardy Clause, Justice Souter noted the increasing use of quasi-criminal sanctions and warned us "to be wary" of presuming that use of the

Post Facto Clause of its vitality. As Justice Stevens observed, "the concerns that animate the Ex Post Facto Clause demand enhanced, and not . . . reduced, judicial scrutiny."[36] That the abdication of enhanced judicial scrutiny should occur with the Ex Post Facto Clause, one of the few specified limitations on the legislative branch identified in the Constitution, and one of the select few liberty-protecting provisions in the Constitution itself (as opposed to the Bill of Rights),[37] is especially problematic.

Testament to the inapposite use of the clearest proof requirement is that it is absent from the proof regime the Supreme Court has prescribed for challenges brought under the Bill of Attainder Clause and the Contracts Clause, the two other chief prohibitions on legislative power specified in Article I, section 10.[38] The absence of the requirement

---

clearest proof requirement "is likely to be as rare in the future as it has been in the past." *Id.* at 114 (Souter, J., concurring). His words were prescient. The clearest proof standard is now a mainstay of punishment question analysis, regularly barring relief.

[36] *California Department of Corrections v. Morales*, 514 U.S. 499, 522 (1995) (Stevens, J., dissenting).

[37] LOGAN, HISTORY AND ROLE, *supra*, at 6-21 (discussing Framing Era history of the Clause and its liberty-protecting role in the U.S. Constitution).

[38] *See Ogden v. Saunders*, 25 U.S. (12 Wheat.) 212, 286 (1827) ("By classing bill of attainder, ex post facto laws, and laws impairing the

regarding the bill of attainder prohibition in particular, which also turns on whether a law is punitive in nature, and is regarded as the constitutional twin of the Ex Post Facto Clause,[39] underscores the anomaly of its presence in contemporary ex post facto doctrine.

Exacerbating matters, courts have struggled to apply the "clearest proof" requirement. In *Smith v. Doe*, for instance, Justice Souter in his concurring opinion reaffirmed his position that the "heightened burden [of the requirement] makes sense only when the evidence of legislative intent clearly points in the civil direction."[40] He found *Smith* a close case because the Alaska SORA challenged had evidence of both regulatory and punitive purposes. Since the evidence on legislative intent was mixed,

---

obligation of contracts together, the general intent becomes overt apparent; it is the general provision against arbitrary and tyrannical legislation over existing rights, whether of person or property").

[39] *See Carmell v. Texas*, 529 U.S. 513, 536 (2000) (recognizing the "kinship between bills of attainder and ex post facto laws" and citing *Nixon v. Adm'r of Gen. Servs.*, 4333 U.S. 425, 469 n. 30 (1977) (citation omitted) ("The linking of bills of attainder and ex post facto laws is explained by the fact that a legislative denunciation and condemnation of an individual often acted to impose retroactive punishment") and *United States v. Lovett*, 328 U.S. 303, 323 (1946) (Frankfurter, J., concurring) ("Frequently, a bill of attainder was [] doubly objectionable because of its ex post facto features. This is the historic explanation for uniting the two mischiefs in one clause—"No Bill of Attainder or ex post facto law shall be passed.")).

[40] *Smith*, 538 U.S. at 107 (Souter, J., concurring).

there was no justification for requiring the "clearest proof" that the law was punitive.[41] Justice Ginsburg, joined by Justice Breyer, agreed.[42] Over time, as would be expected, judges and justices have disagreed over whether non-punitive legislative intent is "clear" in any given case.[43]

Amici acknowledge that under the prevailing misunderstanding, Plaintiffs would bear the burden of providing the "clearest proof" that SORA is punitive, presuming the Court concludes that Michigan's legislative intent in enacting SORA was non-punitive. Here, however, consideration of the "statute's text and its structure"[44] supports the conclusion that the state in fact had punitive intent when it enacted SORA. This is so for several reasons.

First, as a preliminary matter, the mere fact that Michigan maintains that SORA was not motivated by punitive intent should not be taken at face value. A legislature's characterization of a retroactive law

---

[41] *Id.* at 110.

[42] *See id.* at 115 (Ginsburg, J, concurring) (cleaned up) ("in resolving whether the Act ranks as penal for ex post facto purposes, I would not demand 'the clearest proof' that the statute is in effect criminal rather than civil. Instead, guided by *Kennedy v. Mendoza–Martinez*, I would neutrally evaluate the Act's purpose and effects.").

[43] *See, e.g., Comm. v. Cory*, 911 N.E.2d 187, 194 (Mass. 2009); *id.* at 198-99 (Ireland, J., dissenting, joined by Spina and Cowin, J.J.).

[44] *Smith*, 538 U.S. at 92.

as non-penal is to be expected, given the obvious ex post facto concern attaching to an expressly penal motivation in enacting a burdensome retroactive law. Accordingly, when assessing intent a court must look beyond legislative labels. As the Supreme Court recognized in *Cummings v. Missouri*, the Ex Post Facto Clause was "intended to secure the liberty of the citizen . . . [and] cannot be evaded by the form in which the power of the State is exerted."[45] Roughly a decade later, the Court emphasized that a legislature cannot be allowed to evade the prohibitions of the Clause by ascribing civil form to what is "essentially criminal."[46]

Nor does the fact that Michigan enacted SORA under the aegis of its "police power"—to "protect[] and prevent[]…the commission of future criminal acts"—establish the law's non-punitive cast.[47] Protecting the public and preventing criminal offenses are foundational purposes of the criminal justice system, itself a basic manifestation of governmental

---

[45] *Cummings,* 71 U.S. at 329. *Cf. Trop v. Dulles*, 356 U.S. 86, 95 (1958) (stating in an Eighth Amendment challenge that "[h]ow simple would be the tasks of constitutional adjudication and of law generally if specific problems could be solved by inspection of the labels pasted on them!").

[46] *Burgess v. Salmon*, 97 U.S. 381, 385 (1878).

[47] MICH. COMP. LAWS § 28.721a (2023)

police power authority.[48] Concluding that a legislative body acted with non-punitive intent, in short, merely because it invoked its "police power" authority to protect public safety elides the threshold constitutional question of whether it sought to punish individuals targeted by the retroactive law.

When assessing legislative intent in an ex post facto challenge it is important to consider the context in which a law was enacted.[49] As Justice Souter recognized in his concurrence in *Smith v. Doe*, regarding Alaska's avowed non-punitive intent in enacting its registration and community notification law, "it would be naive to look no further, given pervasive attitudes toward sex offenders."[50] Elaborating, Justice Souter recognized that Alaska's law, like SORA, "uses past crime as the touchstone, probably sweeping in a significant number of people who pose

---

[48] CHRISTOPHER G. TIDEMAN, A TREATISE ON THE LIMITATIONS ON POLICE POWER IN THE UNITED STATES CONSIDERED FROM BOTH A CIVIL AND CRIMINAL STANDPOINT 113 (1886).

[49] *See De Veau v. Braisted*, 363 U.S. 144, 147 (1960) (stating in addressing an ex post facto challenge that a challenged law must "be placed in the context of the structure and history of the legislation of which it is a part"); *Cummings*, 71 U.S. at 286 ("[t]he deprivation of any rights . . . may be punishment, the circumstances attending and the causes of the deprivation determining this fact.").

[50] *Smith*, 528 U.S. at 108-09 (Souter, J., concurring).

no real threat to the community."[51] It therefore should, as Justice Souter wrote, "feed suspicion that something more than regulation of safety is going on; when a legislature uses prior convictions to impose burdens that outpace the law's stated civil aims, there is room for serious argument that the ulterior purpose is to revisit past crimes, not prevent future ones."[52]

Finally, the structure and content of SORA demonstrates punitive legislative intent.[53] State legislators amended SORA only after its predecessor version was held to be punitive by this Court in *Does #1-5 v. Snyder*. And only after considerable delay did they take action, enacting the law now before the Court, a provision retaining almost all of the old law—e.g., lifetime or long registration terms without individual review, extensive in-person reporting, and public stigmatization.[54]

---

[51] *Id.* at 109.

[52] *Id.*

[53] For instance, a judge cannot sentence a defendant unless the defendant has been registered, M.C.L. § 28.724(5), and criminal justice agencies, including the Michigan State Police, Michigan Department of Corrections, probation/parole, and local police, are all involved in registration. M.C.L. §28.724. Moreover, SORA violations trigger severe criminal penalties, up to 10 years of imprisonment. In addition, violations result in mandatory revocation of probation or parole. M.C.L. § 28.729.

[54] *See, e.g.,* Pls' Facts, ECF No. 123-1, PageID.3734-3739.

In this case, at best, the evidence points in conflicting directions. Accordingly, interpreting the "clearest proof" requirement to demand more than the general presumption of constitutionality is particularly inappropriate. Moreover, as this Court noted in invalidating on ex post facto grounds the predecessor version of SORA, satisfying the "difficult" requirement of clearest proof "is not the same as impossible," and Michigan should not be afforded a "blank check" to enact a law retroactively singling out disdained individuals for onerous punitive burdens, very often for their lifetimes.[55]

## CONCLUSION

---

[55] *Snyder*, 834 F.3d at 705. By invalidating SORA on ex post facto grounds, the Court would join a growing body of courts that have concluded that new-generation registration and notification laws, enacted after *Smith v. Doe*, cross the permissible line between permissible regulation and impermissible punishment. Significantly, such laws include regimes, like Michigan's amended SORA law, that do not impose residency restrictions (a feature of Michigan's predecessor scheme struck down in *Snyder*). *See, e.g., Doe v. Alaska*, 189 P.3d 999, 1017 (Alaska 2008); *Wallace v. Indiana*, 905 N.E.2d 371, 384 (Ind. 2009); *Comm. v. Baker*, 295 S.W.3d 437, 447 (Ky. 2009); *State v. Letalien*, 985 A.2d 4, 26 (Me. 2009); *Doe v. Dept. of Public Safety and Corr. Servs.*, 62 A.3d 123, 143 (Md. Ct. App. 2013); *State v. Hinman*, 530 P.3d 1271 (Mont. 2023); *Doe v. New Hampshire* 111 A.3d 1077, 1100-02 (N.H. 2015); *State v. Williams*, 952 N.E.2d 1108, 1112-13 (Ohio 2011); *Starkey v. Oklahoma Dept. of Corrections*, 305 P.3d 1004, 1030 (Ok. 2013).

SORA violates the core commands of the Ex Post Facto Clause and Plaintiffs should therefore be granted relief.

Respectfully submitted,

Dated: October 1, 2025

/s/ David A. Moran

David A. Moran
University of Michigan Law School
701 South State St.
Ann Arbor, MI 48109
(734) 615-5419
morand@umich.edu

*Counsel for Amici*

## APPENDIX A

## List of Amici

**Douglas Berman** is Newton D. Baker/Baker & Hostetler Chair in Law at the Moritz College of Law, The Ohio State University. His principal research focus is in the area of criminal law and criminal sentencing. In addition to publishing multiple books and articles, he is the creator and author of the *Sentencing Law and Policy* blog. After graduating from Harvard Law, Professor Berman served as a law clerk for Judge Jon O. Newman and then for Judge Guido Calabresi, both on the United States Court of Appeals for the Second Circuit.

**Wayne Logan** is University Research Professor at Wake Forest University School of Law. He has written extensively on sentencing and punishment and is the author of *The Ex Post Facto Clause: Its History and Purpose in a Punitive Society* (Oxford Universty Pess, 2022). After graduating from the University of Wisconsin Law School, he clerked for the North Carolina Supreme Court and Judge Robert R. Merhige, Jr. on the U.S. District Court for the Eastern District of Virginia.

**Jonathan Simon** is the Lance Robbins Professor of Criminal Justice Law at the University of California Berkeley. His scholarship focuses on the politicization of crime control including through special measures aimed at highly publicized crimes such as sex offenses. After earning his J.D. and Ph.D. (Jurisprudence and Social Policy) from UC Berkeley, Professor Simon clerked for Judge William C. Canby, Jr. on the United States Court of Appeals for the Ninth Circuit.

**Sonja Starr** is the Julius Kreeger Professor of Law and Criminology at the University of Chicago. She teaches and writes in the areas of criminal law and constitutional law, including a course on the collateral consequences of criminal convictions, and much of her research focuses on issues related to the treatment of individuals with criminal records. She earned her law degree at Yale Law School and clerked for Judge Merrick Garland on the U.S. Court of Appeals for the D.C. Circuit.

**Corey Yung** is the William R. Scott Research Professor at the University

of Kansas School of Law. He is a nationally recognized expert on the law and policy regarding individuals convicted of sexual offenses. After earning his J.D. at the University of Virginia School of Law, Professor Yung served as a law clerk for Judge Michael Melloy on the U.S. Court of Appeals for the Eighth Circuit.

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned certifies that this motion:

(i) Complies with the type-volume limitation in Federal Rule of Appellate Procedure 29(a)(5) and 32(7) because it contains 5,014 words, and

(ii) Complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and (32)(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word in 14-point Century Schoolbook.

Dated: October 1, 2025

/s/ David A. Moran
David A. Moran
University of Michigan Law School
701 South State St.
Ann Arbor, MI 48109
(734) 615-5419
morand@umich.edu

*Counsel for Amici*

## CERTIFICATE OF SERVICE

I certify that on October 1, 2025, the foregoing document was served on all parties or their counsel of record through CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record (designated below).

Dated: October 1, 2025

/s/ David A. Moran
David A. Moran
University of Michigan Law School
701 South State St.
Ann Arbor, MI 48109
(734) 615-5419
morand@umich.edu

*Counsel for Amici*