Nos. 25-1413 / 25-1414

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

MARY DOE; JOHN DOE A; JOHN DOE B; JOHN DOE C; JOHN DOE D;
JOHN DOE E; JOHN DOE G; JOHN DOE H; MARY ROE;
*Plaintiffs - Appellants Cross-Appellees*

v.

GRETCHEN WHITMER, Governor of the State of Michigan; JAMES GRADY, II, Colonel;

*Defendants - Appellees Cross-Appellants*

On Appeal from the United States District Court
for the Eastern District of Michigan,
Case No. 2:22-cv-10209 (Hon. Mark A. Goldsmith)

# AMICUS CURIAE BRIEF

## OF LAW PROFESSORS WILLIAM ARAIZA, ERIC JANUS, AND SANDRA MAYSON IN SUPPORT OF PLAINTIFFS' EQUAL PROTECTION AND SUBSTANTIVE DUE PROCESS CLAIMS

SARAH PRESCOTT (P70510)
*Counsel of Record for Law Professors*
SALVATORE PRESCOTT
PORTER & PORTER, PLLC
105 East Main Street
Northville, MI 48167
(248) 679-8711
*prescott@sppplaw.com*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

INTEREST OF AMICUS CURIAE ........................................................................1

SUMMARY OF ARGUMENT ........................................................................2

ARGUMENT ........................................................................4

I. The Equal Protection Clause Prohibits Legislation Driven by Prejudice or Stereotype. ........................................................................4

A) The Equal Protection Clause Was Intended to Check Animus-Driven Legislation. ........................................................................4

B) Laws with Indicia of Likely Animus Warrant "Exacting" Rational-Basis Review. ........................................................................6

II. Due Process Also Prohibits Legislation Driven by Animus. ............................13

III. Because SORA Bears Indicia of Likely Animus, it Warrants "Exacting" Rational-Basis Review........................................................................15

A) SORA Targets a Highly Disfavored, Politically Powerless Group..............16

B) SORA Imposes Broad and Severe Burdens ..............................................21

C) The Court Should Carefully Assess Whether Automatic Lifetime/Long-Term Registration with No Exit Ramp Can be Rationally Justified. ............24

CONCLUSION ........................................................................27

## TABLE OF AUTHORITIES

### Statutes


Mich. Comp. Laws Ann. § 28.721a ................................................ 21, 25


### Cases


*Bannum, Inc. v. City of Louisville, Ky.*, 958 F.2d 1354 (6th Cir. 1992)........... passim

*Barbier v. Connolly*, 113 U.S. 27 (1884)..................................................5

*Bridges v. Wixon*, 326 U.S. 135 (1945) ..................................................27

*City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432 (1985)............. passim

*City of Richmond v. J.A. Croson Co.*, 488 U.S. 469 (1989) ....................................7

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998).................................... passim

*Does v. Whitmer*, 751 F. Supp. 3d 761 (E.D. Mich. 2024)
(“*Does III*”)..........................................................................9, 18-20, 25

*Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016) (“*Does I*”) .................. 17, 21, 23

*F.C.C. v. Beach Commc’ns, Inc.*, 508 U.S. 307 (1993)..........................................26

*Gundy v. United States*, 139 S. Ct. 2116 (2019)....................................................17

*In re C.P.*, 967 N.E.2d 729 (Ohio 2012)................................................................27

*Lawrence v. Texas*, 539 U.S. 558 (2003)...............................................................23

*Louisville Gas & Elec. Co. v. Coleman,* 277 U.S. 32 (1928) .................................10

*Mississippi Univ. for Women v. Hogan*, 458 U.S. 718 (1982) .................................8

*Obergefell v. Hodges*, 576 U.S. 644 (2015)...........................................................13

*Palmore v. Sidoti*, 466 U.S. 429 (1984).................................................................12

*Plyler v. Doe*, 457 U.S. 202 (1982)................................................................ passim

*Powell v. Keel*, 860 S.E.2d 344 (S.C. 2021)..........................................................26

*Reed v. Reed,* 404 U.S. 71 (1971)....................................................................8, 24-25

*Romer v. Evans*, 517 U.S. 620 (1996) ............................................................ passim

*State in Int. of C.K.*, 182 A.3d 917 (N.J. 2018) ......................................................27

*Tiwari v. Friedlander*, 26 F.4th 355 (6th Cir.),
cert. denied, 143 S. Ct. 444 (2022)...........................................................14-15, 18

*Trop v. Dulles*, 356 U.S. 86 (1958)..........................................................................23

*Trump v. Hawaii*, 585 U. S. 667 (2018)....................................................................11

*U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973) ..........................................9-11

*United States v. Carolene Prod. Co.*, 304 U.S. 144 (1938)................................ 7, 19

*United States v. Skrmetti*, 605 U.S. __, 145 S.Ct. 1816 (2025)..................11, 17, 26

*United States v. Virginia*, 518 U.S. 515 (1996) ..........................................................7

*United States v. Windsor*, 570 U.S. 744 (2013)...........................................................8

*Vance v. Bradley*, 440 U.S. 93 (1979) ......................................................................18

*Vanzant v. Waddell*, 10 Tenn. 260 (1829) ..................................................................5

*Wolff v. McDonnell*, 418 U.S. 539 (1974)..................................................................14

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ..................................................................6

**Other Authorities**

Catherine L. Carpenter, *Panicked Legislation*, 49 J. LEGIS. 1 (2022) .....................18

Daniel Farber & Suzanna Sherry, *The Pariah Principle*, 13 CONST. COMMENTARY 257 (1996) ....................7

Eric Janus, FAILURE TO PROTECT: AMERICA'S SEXUAL PREDATOR LAWS AND THE RISE OF THE PREVENTIVE STATE (2006) ....................1

Eric Janus, Robert Prentky & Howard Barbaree, SEXUAL PREDATORS: SOCIETY, RISK AND THE LAW (2015) ....................1

H. Jefferson Powell, *Reasoning About the Irrational: The Roberts Court and the Future of Constitutional Law*, 86 WASH L. REV. 217 (2011) ....................14

H.L.A. Hart, PUNISHMENT AND RESPONSIBILITY (2d ed. 2008) ....................22

Jennifer C. Daskal, *Pre-Crime Restraints: The Explosion of Targeted, Noncustodial Prevention*, 99 CORNELL L. REV. 327 (2014) ....................21

John Hart Ely, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW (1980) ....................17

Larry Alexander and Kimberly Kessler Ferzan, CRIME AND CULPABILITY: A THEORY OF CRIMINAL LAW (2009) ....................19-20, 22

Philip K. Dick, THE MINORITY REPORT AND OTHER CLASSIC STORIES (1987) ....................21

R.A. Duff, *Pre-Trial Detention and the Presumption of Innocence*, *in* PREVENTION AND THE LIMITS OF THE CRIMINAL LAW 115 (Andrew Ashworth *et al.*, eds., 2013) ....................22

Sandra G. Mayson, *Collateral Consequences and the Preventive State*, 91 NOTRE DAME L. REV. 301 (2015) ....................22

Sandra G. Mayson, *The Concept of Criminal Law*, 14 CRIM. L. & PHIL. 447 (2020) ....................19, 22

Stephen J. Morse, *Preventive Confinement of Dangerous Offenders*, 32 J.L. MED. & ETHICS 56 (2004) ....................22

William D. Araiza, *Objectively Correct*, 71 FLA. L. REV. F. 68 (2020) ....................9

William D. Araiza, ANIMUS: A SHORT INTRODUCTION TO BIAS IN THE LAW
(2017) .............................................................................................................1, 4-6

## INTEREST OF AMICUS CURIAE

Amici are law professors with research and teaching interests that encompass the constitutional questions raised in this case. Amicus William Araiza, Vice Dean and Stanley A. August Professor of Law at Brooklyn Law School, has written extensively about how the concept of "animus" informs and animates equal protection jurisprudence. He is the author of ANIMUS: A SHORT INTRODUCTION TO BIAS IN THE LAW (2017). Amicus Eric Janus is President and Dean Emeritus of Mitchell Hamline School of Law and Director of the Sex Offense Litigation and Policy Resource Center. His relevant scholarship includes FAILURE TO PROTECT: AMERICA'S SEXUAL PREDATOR LAWS AND THE RISE OF THE PREVENTIVE STATE (2006) and SEXUAL PREDATORS: SOCIETY, RISK AND THE LAW (2015) (co-authored with Drs. Robert Prentky and Howard Barbaree). Amicus Sandra Mayson, Professor of Law at Penn Carey Law School, has authored articles examining the interaction of preventive regulation and constitutional constraints on state action. Amici have an interest in the sound application and development of constitutional jurisprudence in this field.[1]

---

[1] The views expressed herein are the personal views of Amici. Affiliations are provided for identification purposes only. No counsel for a party has authored this brief in whole or in part, and no person other than amici curiae and their counsel has made a monetary contribution to the preparation or submission of this brief. See FRAP 29(4)(E).

## SUMMARY OF ARGUMENT

Michigan's Sex Offender Registration Act ("SORA") creates a pariah class of human beings, brands them as categorically and permanently dangerous, and subjects them to state supervision for decades or for life. Michigan asserts that SORA is a civil regulation with the purpose of protecting public safety—a purpose both legitimate and important. But no matter how laudable the state's goals, the Constitution does not afford Michigan free license to demonize, ostracize, and oppress broad groups in perpetuity based on stereotype and fear alone.

Both the Equal Protection Clause and substantive due process forbid irrational legislation that is motivated by resentment or prejudice. As scholars of constitutional law, we hope to assist the Court's deliberations by synthesizing what we see as the case law most applicable to the plaintiffs' equal protection and due process claims. (This brief does not address the plaintiffs' other claims.) As the case law illustrates, indications that a challenged law might be driven by irrational fear or prejudice warrant a close look. This is true even when no suspect classification or fundamental right is at issue. In such cases, both the Supreme Court and this Court have carefully assessed the government's proffered justification(s) to ensure that the law is rationally crafted to achieve legitimate governmental goals.

We urge the Court to recognize that Michigan's SORA has such features of possible animus, and to carefully consider whether Michigan's proffered

justifications offer rational support for the extreme features of SORA. In particular, we urge this Court to assess whether Michigan has provided a rational justification for the automatic imposition of permanent or near-permanent registration for many thousands of Michiganders subject to the registry, with no path whatsoever toward rehabilitation, redemption, and release.

Because other filings before this court address the facts and social science in depth, we incorporate them only as necessary.

## ARGUMENT

### I. The Equal Protection Clause Prohibits Legislation Driven by Prejudice or Stereotype.

The Equal Protection Clause of the Fourteenth Amendment forbids laws that burden a group on the basis of irrational prejudice. As the Supreme Court has established in a line of cases exemplified by *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432 (1985), laws that carry indicia of such prejudice warrant a close look by courts, even if no "suspect" classification is at issue. This more "exacting" rational-basis review (or "rational basis with bite") simply involves a careful interrogation of the state's proffered justifications to ensure that the challenged provision is, in fact, rationally designed to promote a legitimate governmental objective. *Bannum, Inc. v. City of Louisville, Ky.*, 958 F.2d 1354, 1360-61 (6th Cir. 1992). Where the government cannot provide a rational justification, the law violates equal protection. *Id.*

#### *A) The Equal Protection Clause Was Intended to Check Animus-Driven Legislation.*

Since the nation's founding, our constitutional order has reflected concern about legislation targeting particular groups. James Madison worried that "factions" might produce laws driven by "some common impulse of passion . . . adverse to the rights of other citizens, or to the permanent and aggregate interests of the community." William D. Araiza, ANIMUS: A SHORT INTRODUCTION TO BIAS IN THE

LAW 12 (2017) (quoting FEDERALIST NO. 10 (James Madison)). The federal Constitution partially addressed that concern with separation of powers and restrictions on state governments, but it could not eliminate the danger entirely. Taking up the mantle in the new Republic, state courts interpreted their state constitutions to forbid "class legislation" that intentionally burdened a specified group. As one Tennessee court explained, "[w]ere [the law] otherwise, odious individuals and corporate bodies would be governed by one rule, and the mass of the community who made the law, by another." *Vanzant v. Waddel*, 10 Tenn. 260, 270-71 (1829). The Tennessee court found this prospect "too odious to be tolerated in any government where freedom has a name." *Id*.

The Fourteenth Amendment imported the prohibition on class legislation into federal constitutional law. *See e.g.*, Araiza at 19 (noting that "the legislative history of the amendment contains explicit references to class legislation and assurances that the amendment would outlaw caste systems"); *Barbier v. Connolly*, 113 U.S. 27, 32 (1884) (interpreting the Fourteenth Amendment to mean that "[c]lass legislation, discriminating against some and favoring others, is prohibited"); *Plyler v. Doe*, 457 U.S. 202, 213 (1982) ("The Equal Protection Clause was intended to work nothing less than the abolition of all caste-based and invidious class-based legislation.").

Over time, and with the proliferation of regulatory laws that inevitably burdened some people more than others, the Court found the concept of "class

legislation" too amorphous to help it identify *unjustified* group burdens, and the terminology fell out of use. Araiza at 20-28. The underlying principle, however—that the Equal Protection Clause forbids laws that burden one group because of "an impulse of passion" rather than rational reasoning in the public interest—remains an animating principle of equal protection jurisprudence today.

### *B) Laws with Indicia of Likely Animus Warrant "Exacting" Rational-Basis Review.*

A central theme of modern equal protection jurisprudence is that courts should attend carefully to laws that are likely to reflect fear, resentment, stereotype, or irrational prejudice. From its earliest equal protection cases, the Supreme Court has emphasized that such "hostility" is not, "in the eye of the law," a constitutionally permissible legislative motivation. *Yick Wo v. Hopkins*, 118 U.S. 356, 374 (1886).

This principle informs the well-known tiered-scrutiny framework. All laws classify, and most classifications do not trigger any alarm bells. Laws that regulate a certain *activity* rather than a certain group of people, for instance, are generally constitutional and warrant no special scrutiny (leaving aside those few activities explicitly protected by constitutional text, like speech and the bearing of arms). On the other hand, laws that classify by group *traits* can suggest irrational prejudice. The more likely it is that prejudice infects the challenged law, the more stringent the standard of justification the law must meet.

Classifications that are especially likely "to reflect deep-seated prejudice" and "tend to be irrelevant to any proper legislative goal" are highly "suspect." *Plyler*, 457 U.S. at 216 n.14. Such classifications suggest "the kind of 'class or caste' treatment that the Fourteenth Amendment was designed to abolish" and therefore trigger strict scrutiny. *Id.*; *Cleburne*, 473 U.S. at 440 (explaining that race, religion, national origin, and alienage are "are so seldom relevant to the achievement of any legitimate state interest that laws grounded in such considerations are deemed to reflect prejudice and antipathy"); *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989) (explaining that "searching judicial inquiry into the justification for [ ] race-based measures" is necessary to "'smoke out' illegitimate uses of race," including uses motivated by "illegitimate notions of racial inferiority or simple racial politics"). Prejudice can also "curtail the operation of those political processes ordinarily to be relied upon to protect minorities," *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 n.4 (1938), such that unjustified discrimination "is unlikely to be soon rectified by legislative means." *Cleburne*, 473 U.S. at 440; *see also* Daniel Farber & Suzanna Sherry, *The Pariah Principle*, 13 CONST. COMMENTARY 257 (1996).

Classifications that are *sometimes* relevant to governing, but *also* likely to reflect prejudice or stereotype, trigger intermediate scrutiny. *United States v. Virginia*, 518 U.S. 515, 531, 533-34 (1996). "By invoking heightened scrutiny, the Court

recognizes, and compels lower courts to recognize, that a group may well be the target of the sort of prejudiced, thoughtless, or stereotyped action that offends principles of equality found in the Fourteenth Amendment." *Cleburne*, 473 U.S. at 472 (Marshall, J., dissenting). In the context of gender, for example, the goal is "to assure that the validity of a classification is determined through reasoned analysis rather than through the mechanical application of traditional, often inaccurate, assumptions about the proper roles of men and women." *Mississippi Univ. for Women v. Hogan*, 458 U.S. 718, 725–26 (1982).

In other words, one function of tiered scrutiny is to operate as a heuristic to signal legislation that might reflect unwarranted prejudice or stereotype about a given group. *Accord United States v. Windsor*, 570 U.S. 744, 811 (2013) (Alito, J., dissenting) ("The modern tiers of scrutiny . . . are a heuristic to help judges determine when classifications have that "fair and substantial relation to the object of the legislation.") (quoting *Reed v. Reed,* 404 U.S. 71, 76 (1971)). Classifications *likely* to reflect prejudice or stereotype require more careful judicial review and more robust justification, particularly if the law targets a group that is politically powerless.

Consistent with this principle, even when there is no inherently suspect classification at issue, other indications that a law might reflect prejudice or stereotype trigger "the exacting rational relationship standard found in *City of Cleburne*."

*Bannum*, 958 F.2d at 1360. Along with *Cleburne*, the Supreme Court cases that best illustrate this approach are *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528 (1973); *Plyler v. Doe*, 457 U.S. 202 (1982); and *Romer v. Evans*, 517 U.S. 620 (1996).

These cases, sometimes called "animus" cases, illustrate the objective features of legislation that suggest potential stereotype or prejudice.[2] *See generally* William D. Araiza, *Objectively Correct*, 71 FLA. L. REV. F. 68 (2020). As an initial matter, laws that target a politically disfavored group raise the specter of impermissible class legislation. The groups targeted in *Moreno* (hippies), *Cleburne* (the intellectually disabled), *Plyler* (undocumented immigrants), and *Romer* (lesbian, gay, and bisexual people) all fit this description. The concern is most acute when the law imposes broad or severe burdens on the disadvantaged group. *See Romer*, 517 U.S. at 632 ("[The challenged law] has the peculiar property of imposing a broad and undifferentiated disability on a single named group, an exceptional and . . . invalid form of legislation."); *id.* at 633 ("It identifies persons by a single trait and then denies them protection across the board."); *Plyler*, 457 U.S. at 223 ("Section 21.031 imposes a lifetime hardship on a discrete class of children . . . ."). As the *Romer* Court observed, "laws singling out a certain class of citizens for disfavored legal

---

[2] The District Court noted that we "provide no authority showing that a court has adopted these factors as a test." *Does v. Whitmer*, 751 F. Supp. 3d 761, 805 (E.D. Mich. 2024). We hasten to clarify that we present these features simply as our own distillation of the cases.

status or general hardships are rare" because they are so likely to violate equal protection. 517 U.S. at 633. And rarity is itself an alarm: "[d]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision." *Id.* (quoting *Louisville Gas & Elec. Co. v. Coleman,* 277 U.S. 32, 37-38 (1928)) (alteration in original).

When faced with a law that imposes broad burdens on a group likely to be the object of stereotype or prejudice, the Court has carefully assessed the credibility and rationality of the government's proffered justifications. In *Moreno*, for instance, the Court rejected the government's contention that the provision at issue was a fraud-prevention measure. 413 U.S. at 535-37 (noting that, "in practical effect, the challenged classification simply does not operate so as rationally to further the prevention of fraud"). In *Cleburne*, the Court assessed six separate explanations offered by the city and found that they "fail[ed] rationally to justify" the differential zoning treatment at issue. 473 U.S. at 447-50. The *Plyler* majority reasoned that, given the stakes, the challenged law "can hardly be considered rational unless it furthers some substantial goal of the State," then concluded—after considering the state's arguments—that "[n]o such showing was made." 457 U.S. at 224, 230. And in *Romer*, the Court evaluated various justifications offered by the government and found them lacking. 517 U.S. at 635 ("The breadth of the amendment is so far

removed from these particular justifications that we find it impossible to credit them.").

If the government offers no credible explanation that counters the indicia of possible animus, the logical conclusion is that the law is indeed grounded in irrational prejudice or stereotype and therefore violates equal protection. *Plyler*, 457 U.S. at 230; *Moreno*, 413 U.S. at 538; *Romer*, 517 U.S. at 632 (concluding that the challenged provision's "sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class it affects"); *Cleburne*, 473 U.S. at 450 ("The short of it is that requiring the permit in this case appears to us to rest on an irrational prejudice against the mentally retarded . . . ."). The Supreme Court recently reaffirmed this principle in *United States v. Skrmetti*, 605 U.S. __, 145 S.Ct. 1816 (2025). There, the Court *upheld* a challenged law on the ground that it "respond[ed] directly to" the state of the relevant evidence. *Id.* at 1836. As Justice Barrett clarified in concurrence: "To be sure, an individual law 'inexplicable by anything but animus' is unconstitutional." *Id.* at 1853 (Barrett, J., concurring) (quoting and citing *Trump v. Hawaii*, 585 U.S. 667, 706 (2018)); *accord id.* at 1882 n.15 (Sotomayor, J., dissenting) ("Of course . . . courts must strike down any law that reflects the kind of 'irrational prejudice' that this Court has recognized as an illegitimate basis for government action.") (quoting and citing *Cleburne*, 473 U.S. at 450).

The Sixth Circuit applied the "exacting rational relationship standard" in *Bannum,* 958 F.2d 1354. Like *Cleburne*, *Bannum* involved an equal protection challenge to a zoning restriction—in *Bannum*, one that excluded drug-treatment centers for ex-offenders from certain locales on the basis of public-safety concerns. *Id*. at 1355-59. As in *Cleburne*, the restriction burdened a group likely to be the object of prejudice and stereotype. The Sixth Circuit noted that the *Cleburne* Court had "reviewed each justification advanced by the city" for the challenged action and "found them inadequate to establish a rational relationship." *Id.* at 1360 (citing *Celburne*, 473 U.S. at 440). "By the same process," the panel continued, "we reach the same conclusion." *Id.* Addressing the city's public-safety justification, the panel reasoned that "[i]f the city's goal was to protect its residents from recidivists, then *some data reflecting the extent of the danger must exist in order to render the different treatment of CTCs* [Community Training Centers for parolees] *rationally related to that goal*." *Id.* at 1360-61 (emphasis added). Fear alone, whether on the part of legislators or residents, is not adequate. *Id.* at 1361 ("[M]ere negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases [for differential treatment].") (quoting and citing *Cleburne*, 473 U.S. at 448); *see also Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."). The *Bannum* Court concluded that the

differential treatment at issue did not "satisfy the exacting rational relationship standard found in *City of Cleburne*." *Bannum*, 958 F.2d at 1361.

In sum, a central function of the Equal Protection Clause is to check legislation motivated in whole or in part by irrational prejudice, especially when it severely burdens an unpopular group and the democratic process is unlikely to remedy the harm. To be sure, laws that target no suspect or quasi-suspect class need only be rationally crafted to promote the government's legitimate ends, not "substantially related" or "narrowly tailored." But even when no suspect classification is involved, laws that impose broad disabilities on a disfavored group warrant careful consideration to ensure that they are, in fact, supported by a rational justification. If the government can provide no credible explanation of how a challenged law—or portion of a law—rationally promotes a legitimate government interest, the challenged provision violates equal protection.

## II. Due Process Also Prohibits Legislation Driven by Animus.

The principles of equal protection and substantive due process overlap in prohibiting laws that burden private rights based on fear or prejudice. *See Obergefell v. Hodges*, 576 U.S. 644, 673-74 (2015) (discussing "synergy" between equal protection and substantive due process). Substantive due process is most frequently invoked with respect to claims that a law or state action impermissibly infringes on a fundamental right, *e.g. id.*, or that an executive-branch abuse of power "shocks the

conscience," *e.g. Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). But substantive due process also forbids legislatures from burdening liberty or property interests on arbitrary or irrational grounds. *Id.* at 845 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974)) (noting that the "touchstone of due process is protection of the individual against arbitrary action of government"). As the Supreme Court explained in *County of Sacramento v. Lewis*: "We have emphasized time and again that the touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Id. at* 845-46 (1998) (internal quotation marks, citations, and alterations omitted). The scholar H. Jefferson Powell explains:

> Rational-basis scrutiny, as traditionally understood, flows from a presupposition of American constitutionalism so basic and pervasive that it is easy to overlook: in its dealings with persons, the American government is under a constitutional obligation to act rationally. Rationality in turn requires both that public actions make sense and that they make good sense, that they have some legitimate purpose.

H. Jefferson Powell, *Reasoning About the Irrational: The Roberts Court and the Future of Constitutional Law*, 86 WASH L. REV. 217, 228–29 (2011) (emphasis omitted). If the government cannot explain how a challenged law that severely burdens the liberty of an unpopular group rationally promotes a legitimate governance interest, that law violates substantive due process as well as equal protection. *Accord Tiwari v. Friedlander*, 26 F.4th 355, 361 (6th Cir.), cert. denied, 143 S. Ct.

444 (2022) ("All laws, whether the challenge arises under the Due Process or Equal Protection Clause, must satisfy rational-basis review, and as a result we look to cases resolved in this area under both Clauses.").

## III. Because SORA Bears Indicia of Likely Animus, it Warrants "Exacting" Rational-Basis Review.

SORA has the telltale features of legislation likely to reflect irrational prejudice. To be clear, we do not mean to suggest that people with sex-related convictions should be deemed a suspect (or semi-suspect) class. Rather, we urge the Court to recognize that this law is importantly different from the great mass of regulatory laws that give no special cause for constitutional concern. SORA is distinct in that (1) it regulates a class of persons, rather than a class of activities or things, (2) the class it targets is a reviled and politically powerless group, (3) it imposes broad and undifferentiated burdens, and (4) it both invokes and conveys the judgment that people convicted of sex-related crimes are irredeemably depraved monsters to be shunned in perpetuity, rather than human beings capable of change who are members of the body politic. These features at least raise the possibility that animus is operating behind the scenes. They ought to trigger careful consideration by this Court as to whether Michigan does in fact have a rational—and non-punitive—justification for subjecting thousands of its people to a lifetime of surveillance, ignominy, and fear with no exit ramp at all.

As a preliminary note, we acknowledge that all members of the plaintiff class have committed crimes, some of them truly terrible crimes that deserved heavy punishment. But this is <u>not</u> a relevant justification for SORA's burdens, because Michigan purports to impose them as regulatory rather than punitive measures, and courts have found that the legislature intended SORA to be a civil and forward-looking regime. Michigan therefore cannot assert that the most extreme burdens of SORA are rationally justified because the plaintiff class "deserves it." Moral judgment of the plaintiffs' past acts is not a legitimate rationale for civil harm prevention.

We also acknowledge that some registrants may present such risk that some form of registration is warranted on preventive grounds. That does not detract from the plaintiffs' claims here. What raises the specter of irrational prejudice is the categorical imposition of permanent or near-permanent registration—entailing profound burdens—on extremely broad classes, with no way to seek relief.

***A) SORA Targets a Highly Disfavored, Politically Powerless Group.***

SORA is notable, first, in that it regulates a class of persons rather than a class of activities or objects. Most regulation restricts or conditions behaviors—e.g., the operation of vehicles, the manufacturing and labeling of products, the management of emissions, employment, commerce, etc. It is far less common for regulation to target a group of persons defined by a permanent status. Chief Judge Roberts

invoked this point in *Skrmetti*. Rejecting a dissenting argument for heightened review, Justice Roberts wrote that the challenged law regulated "certain medical treatments" rather than "a class of *persons* identified on the basis of a specified characteristic". *Skrmetti*, 145 S. Ct. at 1833 n.3 (2025). SORA, by contrast, does regulate !'a class of *persons* identified on the basis of a specified characteristic." This is not to say that people with sex-related convictions are a suspect class. The point is that this is one mark of an unusual law warranting careful consideration.

The class at issue—"sex offenders"—is highly likely to be a target of disgust and irrational fear. Those with past convictions for sex offenses are "widely feared and disdained by the general public." *Does #1-5 v. Snyder*, 834 F.3d 696, 705-06 (6th Cir. 2016) ("*Does I*"). They are "some of the least popular among us," "one of the most disfavored groups in our society." *Gundy v. United States*, 139 S. Ct. 2116, 2131, 2144 (2019) (Gorsuch, J., dissenting).

Needless to say, such a despised group cannot rely on the democratic process to protect its interests. In "the pluralist's [political] bazaar" to which the aggrieved are generally, and appropriately, directed to plead their case, John Hart Ely, DEMOCRACY AND DISTRUST: A THEORY OF JUDICIAL REVIEW 152 (1980), no one wants to ally with "sex offenders." As scholar Catherine Carpenter has documented, elected representatives are more inclined to refer to people convicted of sex offenses as "pond scum predators," "monsters," "animals," or "sick predators"; terms like

these "fill congressional and state records" of legislative debate on sex offender registries. Catherine L. Carpenter, *Panicked Legislation*, 49 J. LEGIS. 1, 23 (2022). Talk of "sex offenders" provokes exactly the sort of legislative passions that Madison feared. So although our federal system generally presumes that "even improvident decisions will eventually be rectified by the democratic process," that "essential premise" of judicial deference does not hold here. *Tiwari*, 26 F.4th at 361 (quoting *Vance v. Bradley*, 440 U.S. 93, 97 (1979)).

Without judging the evidence too conclusively ourselves, we note that the record suggests there may have been exactly this kind of democratic breakdown here. It seems that only pressure from the courts have generated any limits on SORA, and then only the most grudging and incremental tweaks. Nothing in the history of Michigan's SORA offers reassurance that the democratic process is adequate to protect this especially marginalized group.

The District Court countered this point by noting that political disregard of sex offenders' interests is understandable. Whereas *Cleburne, Romer*, and *Plyler* "addressed the regulation of politically disfavored groups who did not do anything wrongful or objectionable," the Court wrote, "sex offenders did do something wrongful," "in many cases…in extremely concerning ways," and any political disfavor "is explainable based on conduct that is understandably troubling to law-abiding citizens." *Does v. Whitmer*, 751 F. Supp. 3d 761, 805 (E.D. Mich. 2024)

(“*Does III*”); *see also id.* at 807 (explaining that “[t]he use of strong language in debates about sex offenders should not be surprising” because “[a]ll sex offenses are condemnable and many involve particularly heinous conduct”). The District Court’s implied premise is that anger, fear, and loathing are a perfectly legitimate legislative motive so long as they are directed toward bad people who once did something wrong.

This reasoning deeply errs. The fact that animus toward “sex offenders” is understandable does not make it a legitimate legislative motive. Loathing is not a rational basis for regulation. Quite the contrary: It is precisely because fear and condemnation are so understandable in this context that they are so likely to infect and distort the legislative process. If anything, the District Court’s observations suggest that people convicted of sex offenses are *more likely* than “innocent” disfavored groups to be shut out of “those political processes ordinarily to be relied upon to protect minorities.” *Carolene Prods. Co.*, 304 U.S. at 153 n.4.

To be clear, moral opprobrium can be a legitimate justification for individualized punishment (which is intended to convey the community’s moral judgment of particular wrongful acts, is imposed pursuant to a sentencing judge’s deliberation, and is subject to other unique procedural and legal constraints). *See, e.g.*, Sandra G. Mayson, *The Concept of Criminal Law*, 14 CRIM. L. & PHIL. 447 (2020); Larry Alexander and Kimberly Kessler Ferzan, CRIME AND CULPABILITY: A

THEORY OF CRIMINAL LAW (2009). Moral opprobrium is *not* a relevant or legitimate justification for civil regulation that claims, as its only goal, the prevention of future harm. "[T]he desire to impede a politically unpopular group is not a legitimate state interest," even if the group is unpopular for a reason. *Bannum*, 958 F.2d at 1360.

A second point worth clarifying is that fear (as opposed to opprobrium) can be tied to real danger, which is a legitimate justification for regulation, and *some* aspects of registry regimes motivated by fear and geared toward prevention might well survive exacting review. That point does not undercut the argument here, which is about how courts should approach the analysis rather than what conclusions they should reach. Our argument thus far is only that this Court cannot approach SORA with as robust a presumption of validity as it does any run-of-the-mill statute; it cannot maintain its ordinary assumption that the democratic, legislative process provides a meaningful venue for aggrieved citizens to air their claims.[3] In this context that assumption is patently false. SORA targets a reviled group that cannot fairly air its interests in the political arena. Furthermore, as the next section discusses, SORA imposes broad and severe burdens on the targeted group. For those

[3] The District Court cast this as an argument for "special constitutional protection" for the plaintiffs, *Does III*, 751 F. Supp. at 806, but it is not. The argument is that certain features of legislation—*e.g.*, targeting a politically disfavored group—flag a higher-than-average risk that stereotype and prejudice might be shaping factors, such that courts should assess the state's proffered justifications with care to ensure that they provide rational grounds for the legislation.

reasons, the Court should carefully assess whether the extreme components of SORA that plaintiffs challenge are grounded by rational justifications.

***B) SORA Imposes Broad and Severe Burdens.***

SORA imposes severe burdens on this extremely disfavored group. The law is "a byzantine code governing in minute detail the lives of the state's sex offenders." *Does I*, 834 F.3d at 697. Violations carry heavy criminal penalties. *Id.* at 698. Of most relevance here, the plaintiffs challenge the automatic, permanent-or-near-permanent registration obligations that SORA imposes on most of those subject to it, with no mechanism to seek relief—ever.

In addition to the constant shame, fear, employment challenges, housing obstacles, and relational impediments that registry status inflicts on registrants and their families, we would like to highlight a more subtle harm: SORA is a "pre-crime" regime. *See generally* Philip K. Dick, THE MINORITY REPORT AND OTHER CLASSIC STORIES (1987); Jennifer C. Daskal, *Pre-Crime Restraints: The Explosion of Targeted, Noncustodial Prevention*, 99 CORNELL L. REV. 327 (2014). Michigan narrows and burdens thousands of lives (ostensibly) not to punish past crime, but rather because of what it fears these individuals might do in the future. Mich. Comp. Laws Ann. § 28.721a.

Targeted pre-crime restraint is not our ordinary method of crime control. As H.L.A. Hart once explained, our legal order relies on criminal prohibitions, backed

by the threat of punishment, because this is the "method of social control which maximizes individual freedom within the coercive framework of law." H.L.A. Hart, PUNISHMENT AND RESPONSIBILITY 23 (2d ed. 2008). Criminal prohibitions apply equally to all of us, reflect shared norms, and allow us all equal freedom to choose our own actions. That is, they treat us as "moral agents." *See, e.g.* R.A. Duff, *Pre-Trial Detention and the Presumption of Innocence*, *in* Prevention and the Limits of the Criminal Law 115, 129 (Andrew Ashworth *et al.*, eds., 2013) (opining that a liberal state must treat its subjects as full moral agents); Mayson, *The Concept of Criminal Law*, *supra*. When we do break the law, punishment is directly responsive to our culpability for the particular violation, at least in theory. Alexander and Ferzan, CRIME AND CULPABILITY, *supra*.

Registration, by contrast, is (allegedly) forward-looking. It is triggered by conviction, but the burdens it imposes are not supposed to be punishment for the past act; Michigan does not claim that they are justified because they are deserved. Rather—taking the state at its word—registration is wholly preventive. SORA regulates a broad class of people on the grounds of a character judgment, a prediction. *See* Mayson, 91 NOTRE DAME L. REV. at 317-40. It treats registrants not as capable moral agents, but rather like animals or bacteria, as threats to be contained. *See* Stephen J. Morse, *Preventive Confinement of Dangerous Offenders*, 32 J.L. MED. & ETHICS 56, 57 (2004); Mayson, 91 NOTRE DAME L. REV. at 317-24.

As this Court has vividly put it, SORA "brands registrants as moral lepers." *Does I*, 834 F.3d at 705.

To brand many thousands of people as "moral lepers"—perpetual threats—has a profound cost in human dignity. As the Supreme Court has noted, moral autonomy is a central component of human liberty and dignity, which in turn are central values of our constitutional order. *E.g. Lawrence v. Texas*, 539 U.S. 558, 562 (2003) ("Liberty presumes an autonomy of self . . . ."); *Trop v. Dulles*, 356 U.S. 86, 100 (1958) ("The basic concept underlying the Eighth Amendment is nothing less than the dignity of man."). Regimes that target the "dangerous" for preemptive restraint are dangerous themselves. They often target the politically weak, easily slip the bounds of reason, become self-reinforcing, and tend to expand over time. We urge the Court, at minimum, not to ignore how distinctive SORA is in branding so many as moral lepers for the duration of their lives, or close to it.

Along with the animus that attends the classification "sex offender," the breadth and severity of the burdens that SORA imposes are grounds for judicial concern. *See Romer*, 517 U.S. at 632 ("[Amendment 2 to the Colorado Constitution] has the peculiar property of imposing a broad and undifferentiated disability on a single named group, an exceptional and, as we shall explain, invalid form of legislation."); *Plyler*, 457 U.S. at 224 (reasoning that, "[i]n light of [the] countervailing costs" of the provision at issue, "the discrimination contained in §

21.031 can hardly be considered rational unless it furthers some substantial goal of the State”). A law that imposes broad, severe, and unusual burdens on a reviled group is precisely the kind of law that warrants “exacting” rational-basis review.

### *C) The Court Should Carefully Assess Whether Automatic Lifetime/Long-Term Registration with No Exit Ramp Can Be Rationally Justified.*

Because SORA has the telltale features of legislation likely to reflect irrational prejudice, we urge this Court to carefully consider whether SORA’s automatic long-term registration requirements (with no review mechanism) rest on a rational justification. The Fourteenth Amendment “does not deny to States the power to treat different classes of persons in different ways.” *Reed v. Reed*, 404 U.S. 71, 75 (1971). But it does “deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute.” *Id.* at 75-76. The question before the Court is whether, after decades on the registry, SORA’s criterion for continued subjection to its profound burdens—the existence of an old conviction alone—“bears a fair and substantial relation to the object of the legislation,” the prevention of future sex offenses. *Id.* at 76. Is there any rational reason to deny to individuals who have successfully navigated decades on the registry the chance to petition off it?

It does not appear that the District Court fully considered this question. First, the District Court does not appear to have considered the record evidence with respect to *lifetime/near-permanent* registration, as opposed to with respect to a

registration scheme in the abstract. *Does III*, 751 F. Supp. 3d at 792, 795. Second, the District Court referred to evidence that registration may deter some first-time offenders, because it is so terrible. *Id.* at 795. But general deterrence is notably not "the object of the legislation." *Reed*, 404 U.S. at 76; *see also* Mich. Comp. Laws Ann. § 28.721a (stating that SORA was enacted to prevent "future criminal sexual acts *by convicted sex offenders*") (emphasis added). As the plaintiffs further note, it is not clear that general deterrence is a permissible rationale for preventive civil regulation, as opposed to punishment that is constrained by notions of proportionality with respect to individual crimes committed. Even if it were, the District Court did not invoke any evidence that the *lifetime / near-permanent* registration provisions have incremental deterrence value in any case.

Third, the District Court erred in deeming *Bannum* inapplicable to a case about sex offenders. *Does III*, 761 F. Supp. at 806. As the District Court emphasized, the *Bannum* opinion noted that it dealt with a zoning restriction on community treatment centers, and that the analysis might come out differently if the zoning restriction were limited to group homes for those with prior violent or sex-related convictions. But those statements just clarify the context of *Bannum*'s particular analysis and conclusions. The *Bannum* Court wanted to be clear that it was <u>not opining</u> as to the constitutionality of any hypothetical more tailored zoning restriction. *See Bannum,* 958 F.2d at 1361 ("We do not hold that the city may never

require a conditional use permit for group home uses.”). That limiting dicta does not obviate *Bannum*’s general description of exacting review. Nor does it in any way preclude the plaintiffs’ claims here.

The plaintiffs argue that lifetime / long-term registration with no exit ramp not only fails to “respond [] directly to” the state’s purported goals, *Skrmetti*, 605 U.S. at 22, but instead fails to respond to those goals at all and may undermine them. If it agrees, this Court should find these aspects of SORA to violate equal protection and (substantive) due process. To be clear, the lack of rational justification would mean that these features of SORA violate the Constitution even under conventional rather than “exacting” rational-basis review. We realize that legislatures do not always have comprehensive and credible evidence at their disposal, so that, under standard rational-basis review, courts may defer to a legislative choice even if it is “based on rational speculation unsupported by evidence or empirical data,” *F.C.C. v. Beach Commc’ns, Inc.*, 508 U.S. 307, 315 (1993). However: when a legislative choice is based on speculation that willfully defies the evidence, it ceases to be rational.

To find that SORA exceeds Michigan’s legislative prerogatives would not be radical. Other courts have held registration laws much like this one fail rational-basis review. *See Powell v. Keel*, 860 S.E.2d 344, 348 (S.C. 2021), *reh’g denied* (Aug. 4, 2021) (“[W]e hold SORA’s lifetime registration requirement without any opportunity for judicial review to assess the risk of re-offending is arbitrary and

cannot be deemed rationally related to the legislature's stated purpose of protecting the public from those with a high risk of re-offending."); *State in Int. of C.K.*, 182 A.3d 917, 936 (N.J. 2018) (finding that lifetime registration for juveniles convicted of certain sex offenses fails rational-basis review and so violates substantive due process pursuant to the New Jersey Constitution).[4] The Ohio Supreme Court, relatedly, invalidated an automatic lifetime registration requirement for some juveniles on the ground, *inter alia*, that it violated "fundamental fairness". *In re C.P.*, 967 N.E.2d 729, 750 (Ohio 2012).

## CONCLUSION

"Only by zealously guarding the rights of the most humble, the most unorthodox and the most despised among us can freedom flourish and endure in our land." *Bridges v. Wixon*, 326 U.S. 135, 166 (1945) (Murphy, J., concurring). Justice Murphy's admonition is still true. And SORA registrants may be the most despised among us. The people of Michigan, through their legislature, have every right to impose punishments that express their condemnation of sexual offenses and aim to deter them. But the state may not deploy its regulatory power to consign thousands of people to a lifetime of public ignominy and government supervision based on

[4] Although other courts have upheld registration statutes under rational-basis review, we know of no case rejecting a challenge as tailored as this one (to permanent / long-term registration with no review) with as extensive a record.

anger and fear alone, with no evidence that it is a rational means of preventing harm. Unless Michigan has a rational, non-punitive justification for the breadth and severity of SORA's categorical, permanent, lifetime and long-term registration provisions—which, to our eyes, is not apparent from the record—they violate both the Equal Protection and Due Process Clauses of the Fourteenth Amendment.

Respectfully submitted,

Dated: October 1, 2025

/s/Sarah Prescott
Sarah Prescott (P70510)
*Counsel of Record for Law Professors*
SALVATORE PRESCOTT
PORTER & PORTER, PLLC
105 East Main Street
Northville, MI 48167
(248) 679-8711
*prescott@sppplaw.com*

## LOCAL RULE CERTIFICATION

I, Sarah Prescott, certify that this document complies with FRAP 32(g)(1) including: double-spaced (except for quoted materials and footnotes); at least one inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. FRAP 29(a)(5); FRAP 32(a)(7)(B).

Respectfully submitted,

Dated: October 1, 2025

/s/Sarah Prescott

Sarah Prescott (P70510)
*Counsel of Record for Law Professors*
SALVATORE PRESCOTT
PORTER & PORTER, PLLC
105 East Main Street
Northville, MI 48167
(248) 679-8711
*prescott@sppplaw.com*

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2025, I caused a copy of the foregoing document(s) to be electronically filed with the Clerk of the Court using the Court's ECF system which will send notification of such filing to the attorneys of record.

/s/ Sarah Prescott
Sarah Prescott